UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, LOCAL UNION NO. 20, <br>    *Plaintiff-Relator*, <br><br> *vs.* <br><br> HORNING INVESTMENTS, LLC d/b/a HORNING ROOFING & SHEET METAL COMPANY, LLC, <br>    *Defendant.* | 1:12-cv-00830-JMS-TAB |

## ORDER

Plaintiff-Relator brings this lawsuit under the *qui tam* provisions of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*[1] Presently pending before the Court is a Renewed Motion to Dismiss filed by Defendant Horning Investments, LLC d/b/a Horning Roofing & Sheet Metal Company, LLC ("Horning"). [Dkt. 33.]

### I.
### THE FIRST AMENDED COMPLAINT

Relator Sheet Metal Workers International Association, Local Union No. 20 (the "Union") filed its First Amended Complaint, [dkt. 26], on May 14, 2013, after Horning moved to dismiss the initial Complaint, [dkt. 21]. The Court summarizes the allegations in the First Amended Complaint as follows:

Horning is a construction company that specializes in roofing and sheet metal work. [Dkt. 26 at 2, ¶ 5.] Horning bid on a project (the "Project") that involved replacement of the roof at the Dayton VA Medical Center in Dayton, Ohio (the "Medical Center"). [*Id.* at 2, ¶ 6.] The Project was covered by the Davis-Bacon Act, 40 U.S.C. § 3141, *et seq.* (the "DBA"). [*Id.*] Part

---

[1] The United States has declined to intervene in this action. [Dkt. 11.]

of the bid solicitation process under the DBA included the Davis-Bacon Wage Determination ("Wage Determination"), which set forth, among other things, the wage setting for a roofer for commercial projects in Montgomery County, Ohio where the Medical Center was located. [*Id.* at 3, ¶ 7.] The Union alleges that, at the time Horning began working on the Project, the roofer wage setting for commercial work covered by the DBA was $33.04 per hour, which included the wage and fringe benefit rates. [*Id.* at 3, ¶ 8.] The Union further alleges that the DBA required that subcontractors pay laborers and mechanics "one-and-a-half times the Wage Determination's base rate in addition to the fringe rate of the Wage [D]etermination[;] [t]herefore, Horning is required to pay $45.12 per hour for hours worked by laborers and mechanics over 40 hours per week." [*Id.* at 3, ¶ 10.]

United States Department of Labor ("DOL") regulations required that contractors and subcontractors submit Certified Payroll Registers ("CPR") and Statements of Compliance ("SOC") every week during the Project to the Veterans' Administration ("VA"). [*Id.* at 3, ¶ 11.] Horning was awarded a subcontract to perform roofing work on the Project beginning in July 2011. [*Id.* at 3, ¶¶ 14, 16.]

Nicholas Kent was a member of the Union – a labor organization within the meaning of the National Labor Relations Act, 29 U.S.C. § 152(5) – and applied for work at Horning "with the unexpressed intention of organizing Horning's employees to become members of [the Union]." [*Id.* at 2, ¶ 1; 3, ¶ 18.] Horning hired Mr. Kent in August 2011, and assigned him to work on the Project. [*Id.* at 4, ¶¶ 19, 21.] Mr. Kent worked exclusively on the Project as a roofer during his employment relationship with Horning. [*Id.* at 4, ¶ 22.]

The Union alleges that Horning underpaid Mr. Kent during the time he worked on the Project, and provides specific examples from five weeks of his employment. For example, the

2

Union alleges that for the week of August 29, 2011 through September 4, 2011, Horning underpaid Mr. Kent by $319.00, deducted $200 from his wages and deposited it into a prevailing wage fund (the "Fund") without his authorization, and deducted $124 and deposited it into his 401(k) account. [*Id.* at 4, ¶¶ 23-32; *see also* 5, ¶¶ 33-40 (for week of September 5, 2011 through September 11, 2011, Horning underpaid Mr. Kent by $99.28, deposited $85 into the Fund, and deposited $52.70 into his 401(k)); 5-6, ¶¶ 41-48 (for week of September 12, 2011 through September 18, 2011, Horning underpaid Mr. Kent by $307.28, deposited $200 into the Fund, and deposited $124 into his 401(k)); 6-7, ¶¶ 49-56 (for week of October 10, 2011 through October 16, 2011, Horning underpaid Mr. Kent by $282.96, deposited $200 into the Fund, and deposited $124 into his 401(k)); 7, ¶¶ 57-64 (for week of October 31, 2011 through November 6, 2011, Horning underpaid Mr. Kent by $233.60, deposited $200 into the Fund, and deposited $124 into his 401(k)).]

The Union asserts that Horning presented CPRs and SOCs to the VA which certified it was paying employees in accordance with the Wage Determination, that the presentment of the CPRs and SOCs was necessary in order for Horning to get paid for the Project, but that Horning was in fact paying less than the Wage Determination. [*Id.* at 7-9, ¶¶ 65-79.] While it alleges that "[i]nformation about the actual forms used for the CPR and SOC, as well as the exact time when the forms were submitted is peculiarly within [Horning's] knowledge," it also asserts that "[t]he VA would not have paid Horning or authorized Horning to be paid for work on the Project without the CPR and SOC." [*Id.* at 9, ¶¶ 74, 77.] The Union asserts claims for: (1) liability under the FCA for making or causing to be made false records material to a false claim, [*id.* at 9-10, ¶¶ 80-87]; and (2) liability under the FCA for presenting a false claim for payment under 31 U.S.C. § 3729(a)(1), [*id.* at 10-11, ¶¶ 88-96].

## II.
### STANDARD OF REVIEW

Horning moves to dismiss the Union's First Amended Complaint for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1), and for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). [Dkt. 33.]

### A. Standard for 12(b)(1) Motion

The purpose of a motion to dismiss under Rule 12(b)(1) is to test the sufficiency of the complaint, not to decide the merits of the case. Rule 12(b)(1) requires dismissal of claims over which the federal court lacks subject-matter jurisdiction. Jurisdiction is the "power to decide" and must be conferred upon the federal courts. *In re Chicago, R.I. & P.R. Co.*, 794 F.2d 1182, 1188 (7th Cir. 1986). Whether or not a plaintiff has standing to bring a lawsuit is a jurisdictional requirement that may be challenged through a motion made pursuant to Rule 12(b)(1). *Hoffman v. Gard*, 2010 U.S. Dist. LEXIS 112245, *2 (S.D. Ind. 2010). The burden is on the plaintiff to prove, by a preponderance of the evidence, that subject-matter jurisdiction exists for his or her claims. *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003).

### B. Standard for 12(b)(6) Motion

The Federal Rules of Civil Procedure require that a complaint provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)). In reviewing the sufficiency of a complaint, the Court must accept all well-pled facts as true and draw all permissible inferences in favor of the plaintiff. *Active Disposal Inc. v. City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011). A motion to dismiss asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. 544). The Court will not

accept legal conclusions or conclusory allegations as sufficient to state a claim for relief. *McCauley v. City of Chicago*, 671 F.3d 611, 617 (7th Cir. 2011) (citing *Iqbal*, 129 S.Ct. at 1951). Factual allegations must plausibly state an entitlement to relief "to a degree that rises above the speculative level." *Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012). This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citing *Iqbal*, 129 S.Ct. at 1950).

The FCA is an anti-fraud statute; therefore, the Union's claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See United States ex rel. Gross v. Aids Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). Rule 9(b) states:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

To plead fraud with particularity, a relator must allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *United States v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003) (citation omitted) (addressing sufficiency of allegations in *qui tam* action); *United States ex rel. Gross*, 415 F.3d at 605 (same).

### III.
#### DISCUSSION

Horning moves to dismiss the First Amended Complaint based on the following arguments: (1) the Court does not have subject-matter jurisdiction because the Union is not a proper party to pursue relief under the FCA, [dkt. 34 at 4-7]; (2) the Court does not have subject-matter jurisdiction because the DOL has primary jurisdiction over the issues raised in this matter, [*id.* at 8-10]; (3) the Union has failed to plead its claims with sufficient particularity regarding the presentment of a false claim, [*id.* at 11-15]; and (4) the Union has failed to plead its claims

5

with sufficient particularity regarding damages to the United States government, [*id.* at 15-18].

### A.  12(b)(1) Motion

A federal court always has a responsibility to ensure that it has jurisdiction.  *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 427 (7th Cir. 2009).  The Court takes this responsibility seriously, and subject-matter jurisdiction "always comes ahead of the merits."  *Leguizamo-Medina v. Gonzales*, 493 F.3d 772, 774 (7th Cir. 2007).  Accordingly, the Court will address Horning's subject-matter jurisdiction arguments first.

#### 1.  *Whether the Union is a Proper Relator*

Horning's first argument in connection with its Motion to Dismiss under Rule 12(b)(1) is that the Union is not a proper relator under the FCA because its information is "second-hand," through Mr. Kent, and so it is not the "original source" of the information.  [Dkt. 34 at 4-7.]  Horning argues that allowing the Union to sue does not further the purpose of the FCA, which is to "'encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward…; in accordance with this goal, this section permits only that insider/whistleblower to maintain the qui tam action.'"  [*Id.* at 4.]

The Union responds that a relator need only be the original source of the information forming the basis of the complaint if that information has been publicly disclosed.  [Dkt. 36 at 4.]  Here, it argues, no such public disclosure has taken place.  [*Id.*]  Further, the Union argues that Mr. Kent was acting as an agent of the Union while working at Horning, so the Union is an original source in any event.  [*Id.* at 6.]

Horning replies that, even if there has not been a public disclosure yet, the Union would need the CPRs and SOCs Horning submitted to the government to show presentment of a false claim, which the Union could only obtain through a Freedom of Information Act ("FOIA")

request.  [Dkt. 38 at 4.]  A disclosure through FOIA, it argues, would constitute a public disclosure, trigger the "original source" inquiry, and lead to the conclusion that the Union is not a proper relator due to the second-hand nature of its knowledge.  [*Id.*]

31 U.S.C. § 3730(e) provides four types of actions under the FCA for which the Court does not have jurisdiction, only one of which is potentially relevant here: "an action or claim…, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed…unless the action is brought by the Attorney General or the person bringing the action is an original source of the information."  31 U.S.C. § 3730(e)(4)(A).  As the Union correctly points out, the "original source" inquiry only arises where the allegations forming the basis of the *qui tam* action have been publicly disclosed.  31 U.S.C. § 3730(e)(4)(A); *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009) ("Under § 3730(e)(4), the district court must conduct a three-step inquiry to determine whether it has jurisdiction to hear a qui tam suit under the False Claims Act.  First, it examines whether the relator's allegations have been 'publicly disclosed.'  If so, it next asks whether the lawsuit is 'based upon' those publicly disclosed allegations.  If it is, the court determines whether the relator is an 'original source' of the information upon which his lawsuit is based").  Horning has not argued that the information which forms the basis of this lawsuit has been publicly disclosed.  Indeed, it tacitly admits that it has not by arguing that it necessarily will be because the Union would need to obtain the CPRs and SOCs through a FOIA request.  The Court finds that such an anticipated disclosure does not trigger the "original source" inquiry.[2]

---

[2] The main case Horning cites for the proposition that a relator must be an original source even absent public disclosure – *United States v. Rockwell Int'l Corp.*, 730 F.Supp. 1031 (D. Colo. 1990) – is from outside this Circuit, and is not binding on this Court.  Furthermore, *Rockwell* involved a situation where, unlike here, the relator had no relationship whatsoever with the party having inside knowledge of the alleged wrongdoing.  Conversely, here the Union alleges that

Further, it is not simply the CPRs and SOCs that must have been publicly disclosed to trigger § 3730(e)(4), but rather the statute requires that the "allegations of wrongdoing" must have been publicly disclosed. Even if the CPRs and SOCs were produced pursuant to a FOIA request, and even if that were considered a public disclosure, the "original source" inquiry still would not come into play because the FOIA disclosures would not by themselves disclose any allegations of wrongdoing. *Id.* at 910 ("an FCA relator's complaint is 'based upon' publicly disclosed allegations or transactions when the allegations in the relator's complaint are substantially similar to allegations already in the public domain"). By failing to point to any evidence that the allegations have been publicly disclosed, Horning has failed to properly invoke the original source inquiry. It simply is not relevant here, and does not bar the Court's exercise of subject-matter jurisdiction.[3]

### 2. *Whether the DOL Has Primary Jurisdiction*

Horning argues that the DOL has primary jurisdiction over the Union's claims because the First Amended Complaint contains allegations regarding Mr. Kent's "classification as a Roofer and the resulting wage and fringe benefit rates, along with questions about deductions of portions of wages into [the Fund]," all of which "hinge upon determinations of a complex nature with regard to 'technical, agency-specific expertise' possessed by the governing agency, the [DOL]." [Dkt. 34 at 8.]

The Union responds that where, as here, the allegations relate to misrepresentation of

---

Mr. Kent was acting as its agent. The other case Horning relies upon – *United States ex rel. Mistick PBT v. Housing Auth.*, 186 F.3d 376 (3d Cir. 1999) – involved disclosure pursuant to a FOIA request *before* the *qui tam* action was filed.

[3] Horning also argues that this case should be dismissed because Mr. Kent released all of his claims against Horning, and attaches a copy of the settlement agreement, [dkt. 34-1]. The Union, however, is the relator, not Mr. Kent.

wages, as opposed to misclassification of the type of work performed, the DOL does not have primary jurisdiction. [Dkt. 36 at 10.] Additionally, the Union argues that the Employee Retirement Income Security Act ("ERISA") is not implicated because "[t]he issue is whether Horning submitted claims to the U.S. government knowing the fringe benefit credit listed on the CPR were more than the actual value of the fringe benefits provided to [Mr.] Kent or whether Horning made or used a false record – the CPR – in order to obtain money from the U.S. government," and the Union is not "seeking to hold a benefit plan liable…[,] challenging the administration of the benefit plan…[, or] seeking to hold [Horning] liable for any breaches of fiduciary duty by Plan Administrators or Plan Trustees." [*Id.* at 10-11.]

Horning replies that the Union has characterized this matter as involving the issue of whether "Horning submitted claims to the U.S. government knowing the fringe benefit credit listed on the CPR were more than the actual value of the fringe benefits provided to [Mr.] Kent," and that this valuation of fringe benefits "may only be accomplished by analysis of the 'bona fide' nature of a fringe benefit plan and the appropriate nature of the furnishing of the fringe benefits to employees, all pursuant to regulations issued by the [DOL]." [Dkt. 38 at 6.]

In *United States ex rel. Wall v. Circle C. Const., L.L.C.*, 697 F.3d 345, 352-55 (6th Cir. 2012), the Sixth Circuit Court of Appeals elucidated the circumstances in which a DBA-related FCA claim may be within the DOL's primary jurisdiction. The *Wall* court explained that there is a difference between DBA-related FCA claims based on the *misclassification* of employees versus the *underpayment* of employees. It concluded that the "core dispute" was "misrepresentation, not misclassification" and, thus, the doctrine of primary jurisdiction did not preclude it from deciding the plaintiff's FCA suit. *Id.* at 354; *see also United States ex rel. IBEW, Local Union No. 98 v. The Farfield Co.*, 2013 U.S. Dist. LEXIS 92590, *43-44 (E.D. Pa.

9

2013) (where "the alleged falsity of the false statement 'is not dependent on interpretation' of classifications and wage determinations," "jurisdiction is appropriate in the court system"); *United States of America ex rel. I.B.E.W., AFL-CIO, Local Union No. 217 v. G.E. Chen Constr., Inc.*, 954 F.Supp. 195, 197 (N.D. Cal. 1997) (FCA claims based on allegations that defendants misclassified employees were within DOL's primary jurisdiction, but court had jurisdiction to hear additional claim that defendants submitted false statements and prepared false payroll certifications which misrepresented the wages they actually paid employees since those allegations did not depend on any determination of the proper classification of workers, which would be a DOL responsibility).

Here, the First Amended Complaint can fairly be read to include claims only for the submission of false statements relating to the amount Horning paid employees, and not to any alleged misclassification of workers. Any issues regarding the value of the fringe benefits Mr. Kent received, and how they compared with the value listed on the CPR, are not issues within the sole province of the DOL. The Court is confident that any necessary determinations relating to those benefits are not so technical that they would require the DOL's special expertise for their resolution. Additionally, as the Union points out, the allegations are not directed at the Fund or any mismanagement by the Fund, which might implicate ERISA. Accordingly, the Court finds that the doctrine of primary jurisdiction does not apply to bar its exercise of subject-matter jurisdiction in this case.

### B. 12(b)(6) Motion

Having found that the Court has subject-matter jurisdiction in this case, it now considers whether the Union has pled its allegations with the requisite particularity regarding both the presentment of claims and damages to the government.

*1. Failure to Plead with Particularity Regarding Presentment of Claims*

In connection with its 12(b)(6) Motion to Dismiss, Horning first argues that the Union has not satisfied Rule 9(b)'s heightened pleading requirements regarding presentment of false claims to the government. [Dkt. 34 at 11-15.] Specifically, it asserts that all the Union alleges is that false claims "must have" been submitted to the government, which is not enough to meet Fed. R. Civ. P. 9(b)'s requirements, and that it has not offered representative samples of false claims actually submitted to the government. [*Id.*]

The Union responds that Horning had to submit the false claims to the government in order to be paid, and that according to Horning's argument Mr. Kent would have had to have worked in the payroll department and known the exact time and date Horning submitted the false claims in order for the Union to state a claim under the FCA. [Dkt. 36 at 12.] In short, the Union argues that it has sufficiently pled the who, what, when, where, and how of its claims. [*Id.* at 14-15.]

While the First Amended Complaint does not allege exactly when the false claims were submitted to the government, it does allege the time frame, what the claims certified (*i.e.*, that Horning was paying Mr. Kent in compliance with the Wage Determination), and that the VA would not have paid Horning without the certifications. [*See, e.g.*, dkt. 26 at 7-9, ¶¶ 65-75.] The only way the Union could have known the time and date each CPR and SOC was submitted was if Mr. Kent himself had participated in their submission, which would significantly limit the ability to bring a *qui tam* action and is a limitation the FCA does not impose. *See Leveski v. ITT Educ. Servs.*, 719 F.3d 818, 839 (7th Cir. 2013) (noting that the Seventh Circuit Court of Appeals has "completely refute[d the] contention that [plaintiff] needed to be in a position of authority or responsible for setting the compensation of other employees…in order to have direct and

11

independent knowledge of her FCA claim").

Additionally, Horning argues that the Union only alleges that false claims "must have" been submitted, not that they were actually submitted. [Dkt. 34 at 12 ("Instead of providing concrete examples of what allegedly was submitted as a false claim to the government, including the content of the submissions, the Union has offered only the explanation that Horning is required to submit CPRs and SOCs, meaning the CPRs and SOCs, with allegedly false claims within them, must have been submitted….That is plainly not enough") (emphasis in original).] The Court disagrees both with Horning's characterization of the Union's allegations, and with its conclusion. The First Amended Complaint alleges that Horning submitted CPRs and SOCs during various time periods which certified that it paid Mr. Kent in compliance with the Wage Determination, [dkt. 26 at 8-9, ¶ ¶ 69-73] – it does not merely allege that Horning "must have" submitted the forms.

Significantly, the First Amended Complaint also alleges that the forms had to have been submitted so Horning would be paid for the Project. The allegations regarding the reason the forms had to have been presented distinguishes this case from those relied upon by Horning. *See, e.g., United States ex rel. Gross*, 415 F.3d at 604-05 ("In our view, the insufficiencies in [plaintiff's] second amended complaint relate instead to the first element of the claim, which, in a nutshell, requires that the fraudulent statement's purpose must be to coax a payment of money from the government. As the statute itself puts it, liability attaches only when a false statement is used 'to get a false or fraudulent claim paid or approved by the Government.'…[Plaintiff] has failed to plead this element with the specificity required by Rule 9(b)." Also, plaintiff did not allege when forms were submitted to government, or "why any particular false statement would have caused the government to keep the funding spigot open"); *United States ex rel. Clausen v.*

*Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (plaintiff cannot "merely…describe a private scheme in detail but then…allege simply and without any stated reason…his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government").

Additionally, to the extent that Horning alleges that the Union was required to provide copies of the CPRs and SOCs, the Seventh Circuit Court of Appeals has explicitly rejected such a requirement. *See Leveski*, 719 F.3d at 839 ("[Plaintiff] need not produce copies of the [forms] in which [defendant] certified compliance…at the outset of her lawsuit. For now, an inference is enough. [Plaintiff] observed [defendant] receive federal funding throughout her employment, and [defendant] could only have received federal funding by certifying compliance…."); *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854-55 (7th Cir. 2009) ("We don't think it essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit. True, it is essential to show a false statement. But much knowledge is inferential…and the inference that [defendant] proposes is a plausible one. [Defendant's] contracts with the United States require the firm to submit, with each request for payment, a [certification]….[Plaintiff] contends that [defendant] *must* have submitted at least one such certificate, or the military services would not have paid for the goods, given the contractual (and regulatory) requirement that the…certificate accompany every invoice….It is enough to show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy") (emphasis in original); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) (plaintiff did not need to prove personal knowledge that defendant had fraudulently certified compliance with Federal Transit Administration regulations where certifications were necessary to receive funding, and

defendant continued to receive funding).

The Union's presentment allegations, along with allegations setting forth the who, what, when, where, and how of the alleged FCA violations, is enough to satisfy Rules 12(b)(6) and 9(b). This case is at the pleadings stage, not summary judgment, and the Court will not conflate the proof requirements on summary judgment with the requirements at the pleadings stage of a *qui tam* action. *United States ex rel. Gross*, 415 F.3d at 604 (distinguishing between summary judgment requirements and pleadings requirements in a *qui tam* action); *Lusby*, 570 F.3d at 855 ("To say that fraud has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement)….No complaint needs to rule out all possible defenses") (emphasis in original). The allegations here are enough to put Horning on notice of what it needs to defend against. *See, e.g., Lachmund v. ADM Investor Servs.*, 191 F.3d 777, 783 (7th Cir. 1999) (Rule 9(b)'s purpose "is to ensure that the party accused of fraud, a matter implying some degree of moral turpitude and often involving a 'wide variety of potential conduct,' is given adequate notice of the specific activity that the plaintiff claims constituted the fraud so that the accused party may file an effective responsive pleading").[4]

### 2. Failure to Plead With Particularity Regarding Damages to Government

Horning argues that the Union has "failed to show any economic injury to the United States government, as required under the FCA," and specifically that "[t]he present situation, in which the Union is claiming Horning's employees were not paid in accordance with the [DBA], does not inherently suggest any economic loss to the government." [Dkt. 34 at 15-16.]

The Union responds that it is not required to plead damages with specificity because

---

[4] Because the Court finds that the Union has adequately alleged presentment, it need not decide whether 31 U.S.C. § 3729(a)(1)(B)'s requirement of a "false record or statement" means presentment of a false claim to the government. [*See* dkts. 36 at 13-14; 38 at 9-10.]

damage is not an element of an FCA cause of action. [Dkt. 36 at 17-18.] It also asserts that, in any event, it has shown that the government was damaged by Horning's conduct because the government would not have paid Horning had it known that Horning was not satisfying the DBA's wage requirements, and because the government did not receive the benefit of its bargain. [*Id.*]

Horning replies that the only situation where damage is not an element of an FCA violation is where the defendant has unsuccessfully submitted false claims, and that is not the case here because the Union only claims that Horning submitted successful claims which resulted in payment. [Dkt. 38 at 10-11.] It argues that the Union "must present some evidence of economic loss to the government in order to plead an actionable claim under the FCA and the pleading standards of Rule 9(b)." [*Id.* at 11.]

The Union alleges in the First Amended Complaint that:

- "The U.S. Government was damaged by Horning's conduct because it did not receive the bargain it made for the Project," [dkt. 26 at 10, ¶ 86];

- "The U.S. Government was damaged by Horning's violation of the FCA because it would not have paid Horning any money if Horning would have submitted the claims containing truthful information about the amount of compensation Horning provided to its employees," [*id.* at 10, ¶ 87];

- "The U.S. Government was damaged by Defendant's conduct because it did not receive the bargain it made for the Project. Specifically, the U.S. Government bargained for all individuals performing work on the project to be paid at the rates established in the Wage Determination, and the individuals who worked for Defendant did not get paid such rates," [*id.* at 11, ¶ 96]; and

- "The U.S. Government was damaged by Horning's violation of the FCA because it would not have paid Horning any money if Horning would have submitted the claims containing truthful information about the amount of compensation Horning provided to its employees," [*id.*].

These allegations – particularly allegations that the government "did not receive the bargain it made for the Project," [*id.* at 11, ¶ 96] – are enough to sustain the Union's FCA claims

at the motion to dismiss stage.[5]  *See, e.g., United States ex rel. Windsor v. Dyncorp, Inc.*, 895 F.Supp. 844, 851 (E.D. Va. 1995) ("[I]f [the defendant] intentionally paid its workers lower wages than were due by misclassifying them," then there is a loss to the government "because in calculating its bid for the contract, [defendant] was required by the government to use a composite [DBA] wage rate.  In short, as with all [DBA] contracts, the government paid more for the contract in order that the workers would be paid more.  Thus, if [the relator's] allegations of intentional misclassification are true, the government was deprived of a benefit of its bargain and was, in that sense, overcharged").

## IV.
### CONCLUSION

The Court finds that it has subject-matter jurisdiction over this matter, and that the First Amended Complaint meets the requirements of Rules 12(b)(6) and 9(b).  Accordingly, Horning's Renewed Motion to Dismiss, [dkt. 33], is **DENIED**.  The case will proceed accordingly.

10/01/2013

*signature*

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Elijah D. Baccus
WIDMAN & FRANKLIN
eli@wflawfirm.com

Alvin Jackson Finklea III
SCOPELITIS GARVIN LIGHT & HANSON
jfinklea@scopelitis.com

---

[5] The Court need not address whether damage is a necessary element of an FCA claim where only successful presentments are alleged, or whether damage must be pled with specificity, since the Union *has* pled damage with specificity.

Jill Z. Julian
UNITED STATES ATTORNEY'S OFFICE
jill.julian@usdoj.gov

Andrew F. Marquis
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
amarquis@scopelitis.com

Marilyn Lee Widman
WIDMAN & FRANKLIN
marilyn@wflawfirm.com